70477. SEASIDE PETROLEUM COMPANY, INC. v. STEVE E. RAWL, INC.
(339 SE2d 601)

CARLEY, Judge.

On October 2, 1978, a "Motor Fuel Sales Contract" was entered into by and between Knight Oil Company (Knight Oil), assignor of appellant Seaside Petroleum Company, Inc. (Seaside) as seller and appellee Steve E. Rawl, Inc. (Rawl) as buyer. The operative language of the agreement was that "[Knight Oil] agrees to sell and deliver to [Rawl] . . . [Rawl's] requirements of Exxon, Exxon unleaded, and Exxon Extra at the prices and upon the terms herein contained." The agreement was to be effective from the date of the contract for a period of ten years and included the following provision: "There is no understanding or agreement, express or implied, on any of the subjects referred to in this agreement other than those specifically stated herein." All of Knight Oil's rights and obligations under the agreement were transferred to appellant Seaside on June 19, 1981. In 1981, Rawl sent Seaside a letter stating: "[A]fter November 15, 1981, Steve E. Rawl, Inc., will no longer require any goods or services from you." The pleadings show that, thereafter, Rawl purchased all of its gasoline requirements from Gulf Oil. Seaside brought this action for breach of contract against Rawl. Summary judgment was granted in favor of Rawl, and Seaside appeals.

1. Seaside contends that the agreement is ambiguous and that a jury question remains as to the intentions of the parties. Particularly, Seaside contends that there was an unexpressed obligation of Rawl to buy from Seaside all of its requirements of gasoline and not just its requirements of Exxon. A review of the document indicates that not only is there no obligation imposed upon Rawl to purchase all of its requirements of gasoline from Seaside, but also that there is no obligation imposed upon Rawl to buy even its Exxon requirements from

Seaside. "While the writing attached to the [complaint] as an exhibit purports to bind [Seaside, as seller's assignee, to furnish all of Rawl's requirements for the named products], one may look in vain for *any* promise of [Rawl] that it will purchase or distribute *any* of such products." (Emphasis supplied.) *Miami Butterine Co. v. Frankel*, 190 Ga. 88, 94 (8 SE2d 398) (1940). See also *Pepsi-Cola Co. v. Wright*, 187 Ga. 723 (2 SE2d 73) (1939); *Morrow v. Southern Express Co.*, 101 Ga. 810 (28 SE 998) (1897); *Sealtest &c. v. Evans*, 103 Ga. App. 835 (120 SE2d 887) (1961). There simply was no promise to purchase contained in the "Motor Fuel Sales Contract."

The Supreme Court's decision in *Crawford v. Baker*, 207 Ga. 56 (60 SE2d 146) (1950) does not require a different result than that we reach in the instant case. By executing the contract at issue in *Crawford*, the retail dealer sought to be held responsible specifically and unequivocally agreed to "sell only and purchase only for resale in the operation of said business, petroleum products handled by the [wholesale dealer]." *Crawford v. Baker*, supra, 59. In *Crawford*, the Supreme Court held that the fact that the wholesale dealer did not specifically agree to furnish the products would not render the contract void for lack of mutuality in an action against the retail dealer who *did specifically agree* to purchase such products. In this case, the retail dealer made no agreement to purchase any products from the wholesaler and the trial court correctly granted summary judgment as to Seaside's claim for breach of the contract to purchase petroleum products.

2. However, a review of Seaside's complaint reveals that, in addition to seeking damages for Rawl's breach of the contract to purchase petroleum products, Seaside also alleged that it had been damaged "in the additional sum of $19,495" as a result of Rawl's failure to return the major part of the equipment placed on Rawl's premises. In this connection, the contract specifically stated that "all equipment installed at buyer's location by seller shall remain the property of seller and buyer shall have no interest therein." The allegations concerning the claim for damages based upon Rawl's failure to return the equipment have not been pierced and the trial court erred in granting summary judgment as to this claim.

*Judgment affirmed in part and reversed in part. Banke, C. J., Deen, P. J., Benham and Beasley, JJ., concur. McMurray, P. J., Birdsong, P. J., Sognier and Pope, JJ., dissent.*

BIRDSONG, Presiding Judge, dissenting.

The majority finds that in this contract, "not only is there no obligation imposed upon Rawl to purchase all of its requirements of gasoline, but also there is no obligation imposed upon Rawl to buy even its Exxon requirements from Seaside," citing *Miami Butterine*

*Co. v. Frankel*, 190 Ga. 88, 94 (8 SE2d 398).

The contract in *Miami Butterine Co.* unlike the requirements contract in this case, is an "exclusive dealing" contract. Under OCGA § 11-2-306 (2), the buyer in an exclusive dealings contract promises to use best efforts to sell and distribute. Similarly, the buyer in a requirements contract is bound to purchase a quantity not "unreasonably disproportionate to any . . . comparable prior . . . requirements." OCGA § 11-2-306 (1).

In finding that there was no obligation upon Rawl to buy Exxon, the majority ignores the Supreme Court's early decision in *Fontaine v. Baxley, Boles & Co.*, 90 Ga. 416, 426 (17 SE 1015). There the court, using common sense and interpreting the contract to express the intentions of the parties, said that if the seller complied with his obligation the buyer "would be equally bound to order and receive [the railroad ties] from this [seller], to the exclusion of all others. While he did not expressly promise to do so, such was the fair import of the agreement, according to its tenor and spirit. There can be no doubt that the terms of such an agreement would raise a just expectation on the part of him who engaged to supply and deliver as many cross-ties as the other might need, that the latter would order and receive from him all he needed. It must be remembered, in behalf of both these contracting parties, that cross-ties are not a commodity of general commerce; that they are neither to be procured at all times in the market by one wishing to buy them, nor to be disposed of readily and quickly by one wishing to sell them. On the contrary, demand must prearrange for supply, and supply before becoming abundant must prearrange for demand. Here was a mutual arrangement by which certainty of supply was sought to be secured on the one hand, and certainty of demand on the other. The measure of both was to be one and the same, to wit, the quantity (not exceeding so many in each month) which Fontaine could succeed in pre-engaging to his customers within the period of one year. Such an arrangement was, in its nature, calculated to be mutually beneficial; one of the parties undertaking to make or find a market for this non-commercial or extracommercial article, to the extent of his ability, and the other undertaking to supply it up to a given limit. We think the objection of the want of mutuality was not well taken."

Following that case, the federal court in *Pittsburgh Plate Glass Co. v. Jarrett*, 42 FSupp. 723, 728, said: "In a requirements contract, an agreement by the seller to sell imports an agreement by the buyer to buy. [Cits.] And an agreement by one party to buy binds the other party to sell." Moreover, if there was any lack of mutuality in this contract, it was supplied when Seaside supplied gasoline in accordance with the terms of the contract. *Southern R. Co. v. Cathey*, 28 Ga. App. 521, 522-523 (111 SE 825), and this was received by Rawl

for many years.

The evidence in this case tends to show that during an oil supply crisis Knight Oil (Seaside's assignor) agreed to obtain an allotment of gasoline for Rawl, which would result in Rawl's having a steady supply of gasoline. These are the circumstances underlying the agreement. "Here was a mutual arrangement by which certainty of supply was sought to be secured on the one hand, and certainty of demand on the other. . . . Such an arrangement was, in its nature, calculated to be mutually beneficial." *Fontaine*, supra at 426. Seaside complied with its obligation under the contract, and so did Rawl, as long as it served Rawl to do so. The contract, having been performed, is binding. *Southern R. Co.*, supra.

Moreover, the contract itself provides that Knight Oil (Seaside) furnishes to Rawl certain Exxon equipment and supplies to use for ten years (the term of contract) and gives Rawl an option to buy. This supplies consideration for an agreement by Rawl to purchase Exxon for ten years, *Crawford v. Baker*, 207 Ga. 56, 59-61 (60 SE2d 146). See also *Brack v. Brownlee*, 246 Ga. 818, 819 (273 SE2d 390).

Finally, sworn evidence by Seaside states that exclusive requirements buying is the practice in the industry and is the meaning that is attached by the industry to the language used in this contract. This meaning and usage should be given weight in interpreting the contract. OCGA § 13-2-2 (2).

The cardinal rule in contract interpretation is to ascertain the intent of the parties, and to give the contract that meaning which will best effectuate that intent. *McVay v. Anderson*, 221 Ga. 381 (144 SE2d 741); *Brooke v. Phillips Petroleum Co.*, 113 Ga. App. 742 (149 SE2d 511). To effectuate the parties' intent, the court must take the whole instrument together and consider it in light of the surrounding circumstance. *Brooke*, supra.

Reasonable minds cannot doubt, nor common sense deny, that Knight Oil (Seaside) would not have furnished its equipment to Rawl to use for ten years, without contingency, unless Rawl was intended to and promised to buy its gasoline from Knight Oil during that time. Upon the strength of that promise, in a gasoline shortage Knight Oil secured an allocation of gasoline for Rawl which, the evidence suggests, it could not have done except by obtaining it from one company, Exxon. There is *no* indication whatsoever in the contract that Rawl was *not* intended to buy only Exxon gasoline during this term.

The language and terms of the contract viewed in light of the surrounding circumstances, leave no question but that Rawl promised to and was intended to buy only Exxon. At the very least, the issue is a jury question. "The construction which will uphold a contract in whole and in every part is to be preferred." *Hearn v. Old Dominion Freight Lines*, 172 Ga. App. 658, 659 (324 SE2d 517). To hold as the

majority does is to presume the parties intended it to be meaningless and unenforceable, even though they performed under it for several years until Rawl decided it did not want to perform it, and even though Rawl continued and continues to use Seaside's equipment. The law seeks to uphold contracts so long as it can enforce *the intent of the parties.* The majority has not done so in this case although it could have done so easily without going outside its terms, by giving the common sense meaning, in light of all the surrounding circumstances and the entire contract, to the terms by which the seller agreed to, *and did,* "sell and deliver to [Rawl] . . . [Rawl's] requirements of Exxon, Exxon Unleaded, and Exxon Extra at the prices and upon the terms herein contained."

I respectfully dissent. I am authorized to state that Presiding Judge McMurray, Judge Sognier, and Judge Pope join in this dissent.

DECIDED NOVEMBER 20, 1985 —
REHEARING DENIED DECEMBER 6, 1985 —

*George M. Rountree,* for appellant.
*John J. Ossick, Jr.,* for appellee.